

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-24-2002

# PA Fedr Sportsmens v. Seif

Precedential or Non-Precedential: Precedential

Docket No. 00-2139

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"PA Fedr Sportsmens v. Seif" (2002). *2002 Decisions*. Paper 431.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/431

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed July 24, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 00-2139 and 01-1683

PENNSYLVANIA FEDERATION OF SPORTSMEN'S CLUBS,
INC.; PENNSYLVANIA CHAPTER SIERRA CLUB;
PENNSYLVANIA TROUT, INC.; TRI-STATE CITIZENS
MINING NETWORK; MOUNTAIN WATERSHED
ASSOCIATION, INC.
        Appellants in 01-1683

v.

*DAVID E. HESS, Individually and as Secretary,
Pennsylvania Department of Environmental Protection;
*GALE A. NORTON, Secretary, United States Department
of the Interior; *JEFFREY D. JARRETT, Director, Office of
Surface Mining Reclamation and Enforcement

PENNSYLVANIA COAL ASSOCIATION;
PENNSYLVANIA ANTHRACITE COUNCIL; ARIPPA,
        Intervenors in D.C.

*David E. Hess,
        Appellant in 00-2139

*Pursuant to F.R.A.P. 43(c)

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
D.C. Civil. No. 99-cv-01791
District Judge: The Honorable Sylvia H. Rambo

Argued April 8, 2002

Before: McKEE, BARRY, and ALARCON,*
Circuit Judges

(Opinion Filed: July 24, 2002)

        Dennis Whitaker, Esq. (Argued)
        Department of Environmental
         Protection
        909 Elmerton Avenue, 3rd Floor
        Harrisburg, PA 17110

        Attorney for Appellant

        Kurt J. Weist, Esq. (Argued)
        PennFuture
        610 North Third Street

Harrisburg, PA 17101

Attorney for Pennsylvania Federation,
et al.

John T. Stahr, Esq. (Argued)
United States Department of Justice
Environment & Natural Resources
 Division
P.O. Box 23795
L'Enfant Plaza Station
Washington, D.C. 20026
Attorney for Secretary of Interior,
etc., et al.

OPINION OF THE COURT

BARRY, Circuit Judge:

The central question we must answer, a question
heretofore answered by only one other court of appeals, is
whether the Eleventh Amendment bars suit in federal court
against a state official where what is at issue is that

_____

* The Honorable Arthur L. Alarcon, Senior Circuit Judge, United States
Court of Appeals for the Ninth Circuit, sitting by designation.

2

official's purported failure to implement, administer,
enforce, and maintain a federally approved state coal
mining program. We find that it does and, thus, will affirm
in part and reverse in part the orders of the District Court.

I.

INTRODUCTION

The two appeals now before us stem from a complaint
filed under the Surface Mining Control and Reclamation Act
of 1977 ("SMCRA"), 30 U.S.C. S 1201-1328 (1988 & Supp.
IV 1993), by five non-profit sporting and environmental
organizations -- the Pennsylvania Federation of
Sportsmen's Clubs, Inc.; the Pennsylvania Chapter Sierra
Club; Pennsylvania Trout, Inc.; Tri-State Citizens Mining
Network; and the Mountain Watershed Association, Inc.
("plaintiffs"). More specifically, plaintiffs filed suit under
Section 520 of SMCRA, 30 U.S.C. S 1270, which permits
citizens suits to be commenced in federal district court by
"any person" against, as relevant here, a"State regulatory
authority to the extent permitted by the eleventh
amendment to the Constitution." S 1270(a)(2).1 Jurisdiction

_____

1. Section 1270(a) reads in full:

    S 1270. Citizens suits

(a) Civil action to compel compliance with this chapter

Except as provided in subsection (b) of this section, any person having an interest which is or may be adversely affected may commence a civil action on his own behalf to compel compliance with this chapter --

(1) against the United States or any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution which is alleged to be in violation of the provisions of this chapter or of any rule, regulation, order or permit issued pursuant thereto, or against any other person who is alleged to be in violation of any rule, regulation, order or permit issued pursuant to this subchapter; or

(2) against the Secretary or the appropriate State regulatory authority to the extent permitted by the eleventh amendment to

3

was also invoked under 28 U.S.C. SS 1331 and 1361. Defendants in this action for declaratory and injunctive relief are James M. Seif, Secretary, Pennsylvania Department of Environmental Protection ("DEP");2 Gale A. Norton, Secretary, U.S. Department of the Interior; and Glenda H. Owens, Acting Director, Office of Surface Mining Reclamation and Enforcement. The Pennsylvania Coal Association, the Pennsylvania Anthracite Council, and ARIPPA were permitted to intervene as defendants.

Seif is the sole named defendant in Counts One through Eight of the eleven-count complaint, the only counts before us on these appeals. While we will at a later point discuss these counts in detail, it is sufficient for present purposes to note that Counts One through Six allege that Seif failed to perform various nondiscretionary duties in connection with implementing, administering, enforcing, and maintaining the approved Pennsylvania surface coal mining program in accordance with SMCRA, the federal implementing regulations, and provisions of the approved Pennsylvania program. Counts Seven and Eight allege Seif 's failure to perform a nondiscretionary duty only under SMCRA and 30 C.F.R. SS 938.16(h) and 732.17(f)(1), respectively.

Seif moved before the District Court to dismiss Counts One through Eight on various grounds, including the ground that they were barred as against him by the

_____

the Constitution where there is alleged a failure of the Secretary or the appropriate State regulatory authority to perform any act or duty under this chapter which is not discretionary with the Secretary or with the appropriate State regulatory authority.

The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties.

2. Suit was brought against Seif in his official and his individual

capacities. After considering the nature of the relief sought as to him, i.e., injunctive relief for acts within his official responsibilities, the District Court treated the claims as properly pursued against him only in his official capacity. Plaintiffs have not taken issue with this determination, nor will we. Parenthetically, we will, as do the parties, continue to refer to "Seif " although he is no longer Secretary of the DEP.

Eleventh Amendment and that the Ex parte Young exception to Eleventh Amendment immunity did not apply because plaintiffs' claims arose under state law. The District Court granted that motion as to all counts save Counts One and Three. Seif appealed the District Court's partial denial of his motion to this Court (docketed at 00-2139) and plaintiffs moved for reconsideration as to Counts Four, Six, Seven, and Eight of the six dismissed counts.

The District Court treated plaintiffs' motion for reconsideration as one under Fed. R. Civ. Proc. 59(e) to alter or amend the judgment, and we stayed Seif 's appeal pending resolution of that motion. The District Court subsequently granted plaintiffs' motion as to Counts Seven and Eight, and reinstated those counts, but denied it as to Counts Four and Six. Seif amended his notice of appeal to include an appeal from that order; thus, No. 00-2139 is the appeal from the District Court's rejection of Eleventh Amendment immunity for Seif on Counts One, Three, Seven, and Eight. Denials of Eleventh Amendment immunity are immediately appealable under the collateral order doctrine. Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc., 506 U.S. 139, 144-47 (1993).

The District Court also granted plaintiffs' motion as to Counts Two, Four, Five, and Six to certify for interlocutory appeal under 28 U.S.C. S 1292(b) the following"controlling question of law as to which there is a substantial ground for difference of opinion and [as to which] an immediate appeal . . . may advance the ultimate termination of the instant litigation":

> Is Defendant Seif entitled to Eleventh Amendment immunity from suit in federal court as to allegations of continuing violations of duties under the Pennsylvania program when 'States with an approved State program shall implement, administer, enforce and maintain it in accordance with the [SMCRA], this chapter and the provisions of the approved States program,' by 30 C.F.R. S 733.11?

Plaintiffs thereafter successfully moved for permission to appeal in this Court, with the appeal docketed at No. 01-1683. Plaintiffs' appeal and Seif 's appeal have been

consolidated for disposition. We review the District Court's ruling on Eleventh Amendment immunity de novo. Lavia v.

Pennsylvania Dep't of Corrections, 224 F.3d 190, 194-95 (3d Cir. 2000).

II.

THE SURFACE MINING CONTROL AND
RECLAMATION ACT

SMCRA, which has been described as providing "a truly federalist distribution of regulatory authority for the coal-mining industry,"3 was enacted in 1977 in response to Congress's concern over the environmental and societal costs of surface coal mining operations. Congress recognized that the expansion of coal mining to meet this country's energy needs "makes even more urgent the establishment of appropriate standards to minimize damage to the environment and to productivity of the soil and to protect the health and safety of the public." 30 U.S.C. S 1201(d). It recognized, as well, that "because of the diversity, climate, biologic, chemical, and other physical conditions in areas subject to mining operations, the primary governmental responsibility for developing, authorizing, issuing, and enforcing regulations for surface mining and reclamation operations . . . should rest with the States." Id. S 1201(f). Thus, SMCRA was intended to ensure the viability of the surface coal mining industry and to promote federalism. Hodel v. Virginia Surface Coal Mining & Reclamation Ass'n., Inc., 452 U.S. 264, 289 (1981). The Office of Surface Mining Reclamation and Enforcement ("OSM") was established as a subdivision within the Department of the Interior with the Secretary of the Interior ("Secretary"), acting through the OSM, empowered to administer the various state programs for controlling surface coal mining pursuant to the Act. 30 U.S.C. S 1211(a) and (c). OSM's regulations promulgated pursuant to SMCRA are codified at 30 C.F.R. Parts 700-887.15.

_____

3. In re Permanent Surface Mining Regulation Litig., 617 F.2d 807, 808 (D.C. Cir. 1980).

Of critical importance here, SMCRA enables states to "assume exclusive jurisdiction over the regulation of surface coal mining and reclamation operations" on non-Federal and non-Indian lands within the particular state. Id. S 1253(a) (emphasis added). To achieve this exclusive jurisdiction, a state must submit to the Secretary a proposed program "which demonstrates that such State has the capability of carrying out the provisions of[SMCRA] and meeting its purposes." Id. The particular state program must contain state laws which provide for the regulation of surface coal mining and reclamation operations in accordance with SMCRA's requirements. Id.S 1253(a)(1).

The plain language of SMCRA evidences Congress's intent to give the states exclusive jurisdiction over the regulation of surface mining as long as the states enact laws and

regulations that, at minimum, meet the minimum federal
standards, with the federal standards serving only as the
floor and not the ceiling for the state programs. The states
must also demonstrate that they are capable of enforcing
their laws. As we have observed, "[t]here would be no
reason to allow the states to impose their own regulations
if the regulations had to be the same as the federal Act and
regulations." Pennsylvania Coal Association v. Babbitt, 63
F.3d 231, 238 (3d Cir. 1995). Indeed, Congress was well
aware that, at least above the federal minimum, there could
not be a uniform federal standard because of the wide
differences in such things as geology and topography in
areas subject to mining operations in the various states
and the states' familiarity with local conditions. Thus,
Congress determined that "the primary governmental
responsibility for developing, authorizing, issuing, and
enforcing regulations for surface mining and reclamation
operations . . . should rest with the States." 30 U.S.C.
S 1201(f).

While SMCRA's purpose was to "assist" the states in
developing a satisfactory program of laws and regulations,
id. at S 1202(g), once that program was developed in a
particular state, and was approved by the Secretary, the
state would be granted "primary governmental
responsibility" for regulating surface coal mining and
reclamation operations. A state which has been granted

7

"primacy" by virtue of its approved program for regulating
surface mining would then have "exclusive jurisdiction over
the regulation of surface coal mining" within its borders. Id.
S 1253(a).4 As, most recently, the Court of Appeals for the
Fourth Circuit put it, "[W]hen a State's program has been
approved by the Secretary of the Interior, we can look only
to State law on matters involving the enforcement of the
minimum national standards." Bragg v. West Virginia Coal
Ass'n, 248 F.3d 275, 295 (4th Cir. 2001), cert. denied, 122
S. Ct. 920 (2002). We, too, have so held. See Haydo v.
Amerikohl Mining, Inc., 830 F.2d 494, 497 (3d Cir. 1987)
("because Pennsylvania's regulatory plan has been
approved by the Secretary, jurisdiction over the alleged
violations of the state statute and regulations lies
exclusively in the courts of Pennsylvania"); Babbitt, 63 F.3d
at 234 (noting SMCRA's "mechanism" for according states
"exclusive jurisdiction over regulation"); see also Coteau
Properties Co. v. Dep't of Interior, 53 F.3d 1466, 1472-73
(8th Cir. 1995) ("Primacy status gives the state'exclusive
jurisdiction . . . .,' S 1253(a), and state, not federal,
regulations govern once a state program is approved by
OSM."); National Wildlife Fed. v. Lujan, 928 F.2d 453, 464
n.1 (D.C. Cir. 1991) (Wald, J., concurring); Laurel Pipe Line
Co. v. Bethlehem Mines Corp., 624 F. Supp. 538, 540 (W.D.
Pa. 1986). While certain sections of SMCRA delineate those
minimum standards that a state program must contain
before it may be approved by the Secretary, we held in
Haydo, albeit in the context of a suit under a different
SMCRA provision against an operator and not a state, that

those sections "do not themselves create any rights and duties." 830 F.2d at 498 (emphasis added); see also Babbitt, 63 F.3d at 234 ("state program [contains] state laws") (emphasis added).

SMCRA, then, is geared to the initial development of a

---

4. If a state fails to develop its own program, fails to have a submitted program approved, or has the approval of its program withdrawn because of ineffective enforcement, the OSM would regulate surface coal mining and reclamation operations in the state pursuant to a federal program promulgated and implemented by the Secretary. Id. S 1254(a). In that event, the Secretary will have "exclusive jurisdiction" over the regulation and control of surface coal mining in the state.

state program and state law is geared to the administration and regulation under that program. In a nutshell, the Secretary steps back and lets an approved program run. Bragg was firm on this point: "To make this point absolutely clear, SMCRA provides explicitly that when States regulate, they do so exclusively, see id. S 1253(a), and when the Secretary regulates, he does so exclusively, see id. S 1254(a)."5Bragg, 248 F.3d at 294. The Bragg Court went on to hold that private parties could not bring an Ex parte Young action against state officials to compel compliance with the surface mining regulation at issue there because the applicable standards were supplied by state, and not federal, law. Bragg was the first court of appeals to do so and, indeed, the first court of appeals to confront the issue, but more about Bragg later.

Under this arrangement, referred to as "cooperative federalism," Hodel, 452 U.S. at 289; Bragg, 248 F.3d at 288, the Secretary retains a limited and ordered federal oversight role to ensure that the minimum requirements of SMCRA are being satisfied and "to assure that the old patterns of minimal enforcement are not repeated." H.R. Rep. No. 218, 95th Cong., 1st Sess. 129 (1977), reprinted in 1977 U.S. Code Cong. & Ad. News 593, 661. The grant of primacy to a state, however, wholly but "conditionally divest[s] the federal government of direct regulatory authority." Bragg, 248 F.3d at 294 (emphasis in original). If, however, a state fails to implement, enforce, or maintain part or all of an approved state program, the Secretary, among other things, can enforce any part not being enforced and can ultimately withdraw approval of the state program while promulgating and implementing a federal program for that state. 30 U.S.C. SS 1254, 1271.6 In the latter event, the "exclusive jurisdiction" over the regulation

---

5. The separate nature of state and federal programs and regulation is seen throughout SMCRA. See, e.g., 30 U.S.C. SS 1256(a), 1257(a) (each permit application must be made, and may only be issued, "pursuant to an approved State program or [a] Federal program"; S 1258(a) (discussing criteria for reclamation plan submitted "pursuant to any approved State

program or a Federal program").

6. It is the alleged failure of the Secretary and the Director of the OSM to notify the Pennsylvania DEP of its failures with respect to the approved Pennsylvania program and their failure to enforce that program or replace it with a federal program that is the subject of Counts Nine, Ten, and Eleven of the complaint. These counts, brought under the citizens suit provisions of SMCRA against the federal officials only, are not before us on these appeals.

of surface mining in the state reverts to the Secretary; absent this withdrawal of approval, the exclusive jurisdiction to regulate remains with the state with the state enforcing its own laws. Because of the "independence of a state administering an approved state program," "[d]irect intervention by the Secretary in the operation of state regulatory programs is clearly intended as an extraordinary remedy." In re: Permanent Surface Mining Regulation Litig., 653 F.2d 514, 519 n.7, 520 (D.C. Cir. 1981) (en banc) (citation omitted). "The Secretary's primary means of guaranteeing effective state programs," continued the Court, "lies in his approval function at the beginning of the process." Id. at 520.

Indeed, this "either-or" arrangement illustrates why, as the Bragg Court observed, the regulatory structure is not quite cooperative federalism -- SMCRA does not provide for shared regulation. Rather, "SMCRA provides for either State regulation of surface coal mining within its borders or federal regulation, but not both." Bragg, 248 F.3d at 289. We, too, have recognized that although state and federal governments have the potential to exercise jurisdiction over the regulation of surface coal mining, such jurisdiction is never shared. Haydo, 830 F.2d at 497 ("nothing in the statute or the legislative history . . . leads us to believe that anything other than the ordinary meaning of 'exclusive' was intended by the enactors of the SMCRA").7 Exclusive, in

_____

7. Plaintiffs, as well as the federal defendants, argue that on this point, Haydo is at best distinguishable and at worst incorrect. In Haydo, we affirmed the dismissal on jurisdictional grounds of a federal suit by citizens against a mining operator. The citizens alleged that as a result of coal mining on their property by that operator, a well on their property had run dry. When the operator refused to replace their water supply, the Haydos filed suit in federal court, alleging violations of state mining standards issued pursuant to SMCRA, and seeking damages. Id. at 495.

The anti-Haydo argument has two prongs. The first is the suggestion that, under 30 U.S.C. S 1260(b), it is federal law that precludes a state regulatory authority from issuing permits that do not comply with a state's approved regulations, because a regulatory authority may not approve a permit application that does not adhere to the regulations of whichever program (state or federal) governs. This argument, however, conflates the guidelines for the initial approval of a state program by the

other words, means just that -- "exclusive." It does not mean "parallel" or "concurrent."

III.

THE PENNSYLVANIA PROGRAM --
AND PLAINTIFFS' CHALLENGE

A. The Pennsylvania Program

Pennsylvania chose to develop its own regulatory program, and the statutory provisions and regulations subsequently enacted comprehensively regulate, by means of extraordinarily detailed provisions, every aspect of surface coal mining and the surface effects of underground

_____

OSM and the subsequent awards of permits by the state under that program on the one hand, with the "exclusive" jurisdiction that Haydo found is expressly granted to a state once those initial criteria are met, on the other. Most of plaintiffs' anti-Haydo argument focuses on the standards preliminary to the administration of the state program; the conduct in question here, though, involves whether Pennsylvania conformed to the criteria it developed to meet those standards.

The second prong of the anti-Haydo argument is based on the fact that when a state fails to properly administer its program, the federal government may take over and replace the defective state program with federal regulation. 30 U.S.C. SS 1254, 1271. Again, however, this misses the point. Federal law may provide the opportunity for the federal government to correct a defective program, but the existence of that provision does not transform the standards a state establishes as part of that program into federal law.

We acknowledged in Haydo that suits underS 1270 may, of course, be brought for violations of federal law. 830 F.2d at 496. Nevertheless, we affirmed the District Court's dismissal because the Haydos' complaint only alleged violations of state law, not of SMCRA itself. Parenthetically, to the extent that Haydo was criticized by the Fourth Circuit in Molinary v. Powell Mountain Coal Co., Inc., 125 F.3d 231, 236-37 n.5 (4th Cir. 1997), which, like Haydo, was not an Eleventh Amendment case and did not involve a claim against a state official, subsequent case law in that circuit, most importantly Bragg, has severely undercut the Molinary reasoning.

mining. Pennsylvania's proposed program was conditionally approved in July 1982, and Pennsylvania was granted "primacy" and the concomitant exclusive regulatory jurisdiction over (and responsibility for) surface coal mining and reclamation operations on non-federal and non-Indian lands within its borders.8 47 Fed. Reg. 33050-80 (July 30, 1982). The Pennsylvania program is set forth in full in exquisite detail primarily in the Pennsylvania Surface Mining Conservation and Reclamation Act, 52 Pa. Stat. Ann. SS 1396.1-1396.19a (Purdon 1998 & Supp. 2001), which alone fills nearly one hundred pages of text, as well

as portions of the Clean Streams Law, Pa. Stat. Ann. SS 691.1-691.1001 (Purdon 1993), and their accompanying rules and regulations. 25 Pa. Code SS 86.1-86.242 and SS 87.1-87.209. Primary authority to enforce the Pennsylvania program is vested in the Pennsylvania DEP.

The text of the Pennsylvania program as found in Pennsylvania's statutes and regulations is not set forth in 30 C.F.R. S 938, that part of the federal regulations reserved for Pennsylvania. All that is set forth is the notification of the Secretary's program approval, the action taken by the Secretary on amendments proposed by Pennsylvania, and the dates by which other amendments were to be adopted by Pennsylvania. The regulations nonetheless purport to "contain[ ] all rules applicable only within Pennsylvania that have been adopted under [SMCRA]." S 938.1. See alsoS 900.12.

An important environmental problem addressed by SMCRA -- and by Pennsylvania -- was the reclamation of sites after mining operations have ended. In order for a state regulatory program to be initially approved by the Secretary, therefore, the program must include a bonding plan designed to ensure that money is available to reclaim, if necessary, various mine sites, i.e., to restore the site after the coal has been mined. 30 U.S.C. SS 1257(d), 1258; 30 C.F.R. S 800.11(e)(1). To receive a mining permit, operators are required to submit a detailed reclamation plan for the site in question. 30 U.S.C. SS 1257(d), 1258; 52 Pa. C.S.A.

_____

8. The Secretary may grant full primacy to a state with a conditionally approved program. 30 C.F.R. S 732.13(j).

S 1396.4(a)(2). Operators are also required to post a bond to cover the costs of that plan if they default on it.  30 U.S.C. S 1259; 52 Pa. C.S.A. S 1396.4(d).

Under SMCRA, the bonds collected by states from mining operators must be "sufficient to assure the completion of the reclamation plan if the work had to be performed by the regulatory authority," i.e., the state. 30 U.S.C. S 1259(a). As long as the federal objectives of the bonding program are met, a state may also develop an alternative bonding program, such as the one challenged here. 30 C.F.R. S 800.11(e). That regulation requires that, under the alternative program, the state regulatory authority collect sufficient money to complete a reclamation plan for any site which may be in default. Pennsylvania's alternative bonding program was conditionally approved. As part of that program, Pennsylvania requires that before commencing mining operations, an operator must file a bond with the DEP.

> in an amount determined by the department based
> upon the total estimated cost to the Commonwealth of
> completing the approved reclamation plan, or in such

other amount and form as may be established by the department pursuant to regulations for an alternate coal bonding program which shall achieve the objectives and purposes of the bonding program.

52 Pa. C.S.A. S 1396.4(d). In the 1982 approval of the Pennsylvania program, the Secretary explicitly found that the program met SMCRA's minimum criteria for regulating performance bonds. 47 Fed. Reg. at 33056.

Also as part of its program, Pennsylvania implemented guidelines detailing how the amounts of such bonds were to be calculated. First, complying with the explicit federal minimum, 30 U.S.C. S 1259(a), Pennsylvania determined that no bond shall be under $10,000. 52 Pa. C.S.A. S 1396.4(d); 25 Pa. Code S 86.150. Second, under Pennsylvania's bonding program, bonds are supplemented by money from a "bond pool" that may be applied to any defaulting site in the system. This supplemental money is derived from a nonrefundable fee of $100 (originally $50) per acre charged to all operators when a permit is initially

13

issued. 25 Pa. Code S 86.17(e). The Secretary initially expressed concern "about the continuing adequacy of the amount of the bond and permit fee required for permit areas that is applied to bond forfeitures." 47 Fed. Reg. at 33056. The Secretary required Pennsylvania to submit its then-ongoing bonding adequacy review study to the OSM "and to make any adjustments as necessary to cover reclamation costs." Id. at 33057. Again, however, Pennsylvania's program was conditionally approved.

By 1991, Pennsylvania had been notified at least twice by the OSM of that Office's concerns regarding the alternative bonding program. See 56 Fed. Reg. 24687, 24690 (May 31, 1991). Pennsylvania proposed to amend the relevant provision, 25 Pa. Code S 86.17(e), to, inter alia, increase the acreage fee from $50 to $100. 56 Fed. Reg. at 24689. Although this amendment did not alleviate all of the OSM's concerns, the amendment was conditionally approved upon Pennsylvania's representation that it was taking steps to remedy any existing deficits. Id. at 24690. More specifically, the approval was conditioned on Pennsylvania's demonstration that the bond money, together with the acreage fees, would meet the requirements of 30 C.F.R. 800.11(e) to (1) have available sufficient money to complete the reclamation plan for any areas that might be in default and (2) provide a substantial economic incentive for mine operators to comply with all reclamation provisions. See 56 Fed. Reg. at 24690. Subsequently, this increase in acreage fee was approved as an "intermediate step to keep the shortage in the [bond] Fund from further deteriorating." 58 Fed. Reg. 36139, 36140 (July 6, 1993). The $100 fee, collected in addition to the bonds posted under 25 Pa. Code SS 86.145, .149, and .150, remains in force today. See 25 Pa. Code S 86.17(e). Technically, then, the bond requirements of the Pennsylvania program -- $10,000 plus

the additional $100 per acre -- exceed the federal
minimum.

Finally, as part of the alternative bonding program, the
Pennsylvania DEP is responsible for establishing rate
guidelines and the method for determining the amounts of
reclamation bonds above the $10,000 and $100 per acre
floor. 25 Pa. Code S 86.145. Those guidelines are set forth

14

in 52 Pa. C.S.A. S 1396.4(d), which requires that
consideration be given to very specific factors as well as
other "criteria as may be relevant."9 A longer list appears in
S 86.149 of the Pennsylvania Code.10  Moreover, again

_____

9. Section 1396.4(d) reads in part as follows:

> Said estimate shall be based upon the permittee's statement of his
> estimated cost of fulfilling the plan during the course of his
> operation, inspection of the application and other documents
> submitted, inspection of the land area, and such other criteria as
> may be relevant, including, but not limited to, the probable difficulty
> of reclamation giving consideration to such factors as topography,
> geology of the site, hydrology, the proposed land use and the
> additional cost to the Commonwealth which may be entailed by
> being required to bring personnel and equipment to the site after
> abandonment by the permittee, in excess of the cost to the permittee
> of performing the necessary work during the course of his surface
> mining operations.

52 Pa. Stat. Ann. S 1396.4(d).
10. Section 86.149 reads as follows:

> S 86.149. Determination of bond amount.
>
> (a) The standard applied by the Department in determining the
> amount of bond will be the estimated cost to the Department if it
> had to complete the reclamation, restoration and abatement work
> required under the acts, regulations thereunder and the conditions
> of the permit. The Department may establish bonding rate
> guidelines which utilize the factors in S 86.145(c) (relating to
> Department responsibilities).
>
> (b) This amount will be based on, but not limited to, the following:
>
> (1) The estimated costs submitted by the permittee in accordance
> with S 87.68, S 88.96, S 88.492,S 89.71 or S 90.33.
>
> (2) Reclamation costs for surface mines related to the specific size
> and geometry of the proposed mining operation, the topography
> and geology of the permit area, the potential for water pollution or
> hydrologic disturbances, the availability of topsoil and the
> proposed land use.
>
> (3) The costs related to distinct differences in mining methods and
> reclamation standards for bituminous surface mines, anthracite
> surface mines and underground mines.

(4) The cost of relocating or reconstructing roads or streams
within the permit area.

15

conforming with federal law,11 the DEP may increase the
required bond amount "should such an increase be
determined by the department to be necessary to meet the
requirements of this act." 52 Pa. C.S.A. S 1396.4(d).

B. Plaintiffs' Challenge

Plaintiffs' primary argument is that the Pennsylvania
program, with its extensive and detailed standards geared
specifically to Pennsylvania, has been incorporated into
SMCRA because it has been "codified" in the C.F.R. and
this "codification" renders issues concerning the

---

(5) The cost of sealing shafts or other mine openings, removal of
buildings, facilities or other equipment, constructing, operating
and maintaining treatment facilities and correcting surface
subsidence.

(6) The additional estimated costs to the Department which may
arise from applicable public contracting requirements or the need
to bring personnel and equipment to the permit area after its
abandonment by the permittee to perform reclamation, restoration
and abatement work.

(7) The amount of fees, fines or other payments made to the
Department and dedicated by the Department for reclamation,
restoration and abatement of defaulted permit areas.

(8) Additional estimated costs necessary, expedient and incident
to the satisfactory completion of the requirements of the acts,
regulations thereunder and the conditions of the permit.

(9) An additional amount based on factors of cost changes during
the preceding 5 years for the types of activities associated with the
reclamation to be performed.

(10) Other cost information as required from the permittee or
otherwise available to the Department.

25 Pa. Code S 86.149.

11. "The amount of the bond or deposit required and the terms of each
acceptance of the applicant's bond shall be adjusted by the regulatory
authority from time to time as affected land acreages are increased or
decreased or where the cost of future reclamation changes." 30 U.S.C.
S 1259(e).

16

Pennsylvania program issues of federal, not state, law.
Thus, the argument goes, even though specific violations of

the Pennsylvania program are pinpointed in most of the counts at issue here, it is violations of federal law plaintiffs are alleging in all of the counts, and the Ex parte Young exception to Eleventh Amendment immunity, therefore, poses no bar. Plaintiffs' alternative argument is that even if state law standards are not incorporated into federal law, the state official -- Seif -- nevertheless has a federal statutory duty to implement those standards, a duty he is not fulfilling.

The eight counts before us on these appeals allege the following:

> Count One: Seif failed to maintain a reclamation bonding system that has sufficient funds available to assure the Pennsylvania DEP's prompt completion of the reclamation plan for any defaulting mine site and failed to provide a substantial economic incentive for the operator to comply with the reclamation provisions rather than default;

> Count Two: Seif failed to (a) establish bonding amount rate guidelines that are based on the factors specified in the approved Pennsylvania program and (b) complete annually a review of Pennsylvania's bonding rate guidelines and revise those guidelines, if necessary, to reflect the current cost of reclamation;

> Count Three: Seif failed to raise the bond amount for a particular mine site when the cost of future reclamation increases, including circumstances in which a post-mining discharge develops that an operator is responsible to treat;

> Count Four: Seif used a treatment period of only 50 years in determining the adequacy of bonds for coal mine sites with discharges;

> Count Five: Seif used an across-the-board figure of only $10,000 for repair and reclamation of the surface effects of subsidence when calculating bond amounts for underground coal mines and DEP has not promulgated any regulation or any document under

17

> which operators would be required to post bonds in amounts that are based on factors identified in the Pennsylvania Act and regulations;

> Count Six: Seif used the "capital replacement cost" method to determine the mine drainage treatment component when calculating bond amounts for underground coal mines and failed to consider all costs of treating potential discharges of mine drainage when calculating, adjusting, or releasing the amount of bonds for certain underground coal mines;

> Count Seven: Seif failed to timely submit to OSM

information showing that the revenue derived from Pennsylvania's reclamation fee is adequate to assure that Pennsylvania's alternative bonding system can be operated to meet federal and state requirements, and failed to timely submit to OSM a clarification of the procedures for bonding the surface impacts of underground mines and the reclamation of underground mining permits where the operator has defaulted, both requirements of 30 C.F.R. S 938.16(h); and

Count Eight: Seif failed to submit to OSM, as required by 30 C.F.R. S 732.17, an amendment to the Pennsylvania program that provides additional or alternate financial guarantees for the long term treatment of mine drainage upon notification from OSM that such an amendment was necessary.

The thrust of these eight counts is Seif 's purported failure to perform various nondiscretionary duties vis-a-vis Pennsylvania's reclamation bonding program for surface coal mining in the state. The salient aspects of that program, discussed above, bring into focus the central issue before us on these appeals, i.e., whether the District Court correctly determined, as to each of the various counts of the complaint, that the law allegedly being violated by Seif, and to which plaintiffs seek that he conform his conduct, is federal law or state law. While, we warn, the question is inordinately easier to ask than to answer -- at least as to certain counts of the complaint -- the answer will, virtually without more, enable us to

18

determine whether Seif may or may not properly invoke Eleventh Amendment immunity.

The Supreme Court of the United States, and we, have recently reviewed Eleventh Amendment jurisprudence and we see no reason to reprise that review. See Federal Maritime Comm. v. South Carolina State Ports Authority, 122 S. Ct. 1864, 1870-71 (2002); MCI Telecomm. Corp. v. Bell Atlantic-Pa., 271 F.3d 491, 503-08 (3d Cir. 2001). Suffice it to say, the Eleventh Amendment -- "The Judicial power of the United States shall not . . . extend to any suit. . . commenced or prosecuted against one of the . . . States by Citizens of another State" -- has been interpreted to render states -- and, by extension, state agencies and departments and officials when the state is the real party in interest -- generally immune from suit by private parties in federal court. Indeed, it has been recognized for over two hundred years that a state's immunity from suit in federal court is a fundamental principle of our constitutional structure that preserves, as intended by the Framers, the respect and dignity of the states and protects the ability of the states "to govern in accordance with the will of their citizens." Alden v. Maine, 527 U.S. 706, 751 (1999).

Eleventh Amendment immunity is, however, subject to

three primary exceptions: (1) congressional abrogation, (2) waiver by the state, and (3) suits against individual state officers for prospective injunctive and declaratory relief to end an ongoing violation of federal law. MCI, 271 F.3d at 503. The third exception, the sole exception invoked here, is the doctrine of Ex parte Young, 209 U.S. 123 (1908). As we explained,

> The theory behind Young is that a suit to halt the enforcement of a state law in conflict with the federal constitution is an action against the individual officer charged with that enforcement and ceases to be an action against the state to which sovereign immunity extends; the officer is stripped of his official or representative character and becomes subject to the consequences of his individual conduct. See Young 209 U.S. at 159-60, 28 S.Ct. 441; see also Pennhurst State Sch. and Hosp. v. Halderman, 465 U.S. 89, 103, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (Pennhurst II ) (stating

19

> that, under the theory of Young, an action for prospective relief against the state officer was not an action against the state because the allegation of a violation of federal law would strip the officer of his official authority). The relief sought must be prospective, declaratory, or injunctive relief governing an officer's future conduct and cannot be retrospective, such as money damages. See Pennhurst II, 465 U.S. at 102-03, 104 S.Ct. 900.

> The Young doctrine is accepted as necessary to permit federal courts to vindicate federal rights and to hold state officials responsible to the "supreme authority of the United States." See id. at 105, 104 S.Ct. 900. The doctrine applies both to violations of the United States Constitution and to violation of federal statutes. See Balgowan v. New Jersey, 115 F.3d 214, 218 (3d Cir. 1997) (holding that suit for declaratory relief against state officer under Fair Labor Standards Act is permissible under Young); see also Allegheny County Sanitary Auth. v. U.S.E.P.A., 732 F.2d 1167, 1174 (3d Cir. 1984). However, Young does not apply if, although the action is nominally against individual officers, the state is the real, substantial party in interest and the suit in fact is against the state. See Pennhurst II, 465 U.S. at 101, 104 S.Ct. 900.

Id. at 506.12

In determining whether the Ex parte Young doctrine avoids an Eleventh Amendment bar, the Supreme Court has made it quite clear that "a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." Verizon Maryland, Inc. v. Public Service Commission of Maryland, 122 S. Ct. 1753,

12. We concluded in MCI that neither of the two recognized exceptions to Young, i.e., those of Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261 (1997), and Seminole Tribe of Florida v. Florida , 517 U.S. 44 (1996), barred that action. Given our conclusion that it is state law implicated in Counts One through Six and that, therefore, the Ex parte Young exception does not apply, we need not discuss the exceptions to that exception.

1760 (2002), quoting Coeur d'Alene, 521 U.S. at 296 (O'Connor, J., concurring in part and concurring in the judgment). While the relief sought here is "prospective," the question we must answer is whether the ongoing violations alleged are of federal or state law.13  It bears repetition that state law and the implementing state regulations are the means of effectuating the purposes of SMCRA. Because Pennsylvania is a primacy state, the OSM has relinquished its regulatory authority and regulation is a matter of state law. Thus, a court must initially look to state law, especially where there is an element of state program that mirrors and is thus clearly intended to conform to and/or implement the federal objective. Unless an element of an approved state program is inconsistent with -- i.e., less stringent than -- the federal objective it implements, the state law or regulation is intended to control, rather than the federal provision. This was Congress's intent when it ceded "exclusive jurisdiction" over surface mining regulation in primacy states.

1. Counts One Through Six

As our recitation of Counts One through Six should indicate, those counts challenge the administration or implementation of Pennsylvania's approved alternative bonding program. This was so clear as to Counts Two and Five that plaintiffs did not seek reconsideration of the District Court's dismissal of those two counts. Similarly, as to Counts Four and Six, it is Pennsylvania, not SMCRA, which, respectively, creates the treatment period of fifty years in determining the adequacy of bonds and creates the capital replacement cost method used by Seif for bond calculations. Indeed, no provision of SMCRA or the federal regulations is even cited in Counts Two, Four, Five, and Six, except by boilerplate incorporation by reference. As the District Court put it, "[t]o allow a federal court to second-

_____

13. We note in passing that S 1270(a)(2) of SMCRA applies only to acts or duties which are "not discretionary." While it is far from clear that the acts and duties at issue in Counts One through Six are "not discretionary," that alternative reason for the potential dismissal of those counts is not before us on these interlocutory appeals.

guess certain detailed aspects of a state program infringes

upon state sovereignty," and it is inappropriate "to question a certain discretionary aspect of the state program which was given primacy by the OSM, and to direct the state on what method to use to conduct its calculations." A.32, 33. The District Court correctly determined that, at least as to Counts Two, Four, Five, and Six, this case fell outside the Ex parte Young exception and that Seif enjoyed immunity. Simply put, the Eleventh Amendment prohibits a federal court from considering a claim that a state official violated state law in carrying out his or her official responsibilities. Pennhurst State School and Hospital v. Halderman, 465 U.S. 89 (1984).

> [I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment. We conclude that [Ex parte] Young and Edelman [v. Jordan] are inapplicable in a suit against state officials on the basis of state law.

Id. at 106.

The District Court, however, wrongly came to the opposite conclusion when it refused to dismiss Counts One and Three, based on its finding that those counts stated violations of SMCRA, i.e., federal law. These counts do, at least nominally, allege violations of SMCRA -- and, we note, also allege specific violations of the "approved Pennsylvania program." But saying that certain conduct is a violation of SMCRA does not make it so as a matter of law. Rather, the appropriate inquiry for Ex parte Young purposes is whether a court is being asked to enforce state law or federal law as against an individual state officer. See MCI, 271 F.3d at 507.

The only reference to SMCRA in Count One is a citation to S 1259(a) and (c), which simply set forth the requirements for the performance bond or bonds which are to be filed with the state regulatory authority and states that the Secretary can approve an alternative bonding system. The language of Count One does track a federal

22

regulation, 30 C.F.R. S 800.11(e), but S 800.11(e) merely sets the criteria that guide the OSM when, in its discretion, it determines whether to approve an alternative bonding system that a state proposes. As outlined above, those criteria were met, and Pennsylvania's alternative system was conditionally approved. As such, jurisdiction for its administration and enforcement devolved on the state. Whether, in practice, the Pennsylvania program subsequently meets the minimum standards set forth in SMCRA is a matter for the federal oversight body-- the OSM -- and not for the federal courts. With authority vested in the state, the approved state program developed pursuant to that authority is what governs surface coal

mining operations. The administration and functioning of the state bonding program is thus a matter of state law, and as such prospective relief vis-a-vis that program as against Seif is barred in federal court by the Eleventh Amendment.

The same is true for Count Three, which clearly articulates a closer connection to state provisions than to federal provisions, as evidenced by the example given of a post-mining discharge at a particular mine site. Pennsylvania's bonding program provides detailed guidelines for addressing such discharges. See 52 Pa. C.S.A. S 1396.4(d.2),(g.2),(g.3). SMCRA nowhere discusses them. More generally, however, given the bonding framework established under the state's regulatory program, the explicit guidelines for determining bond amounts developed under that framework, and the language of 52 Pa. C.S.A. S 1396.4(d) authorizing increases when necessary (a statute at least as stringent as its federal counterpart), it is clear that Count Three challenges, and seeks relief under, state, rather than federal, law. It is thus barred in federal court by the Eleventh Amendment. Indeed, any assertion that it is federal law that precludes a state from setting a bond amount that does not comply with state law and, thus, that a district court has jurisdiction to review the state determination as to each particular mine site, is simply beyond the pale.

What should be obvious by now is that, at least implicitly, we have rejected plaintiffs' theory that the

23

Pennsylvania program, with its Pennsylvania-specific standards, has been incorporated or "codified" into federal law. We now do so explicitly.

Plaintiffs point to the language of 30 C.F.R. S 900.11 and S 900.12(a) by which, under S 900.11, a state program establishing surface mining standards "applicable within each State is codified in the part [of the C.F.R. reserved] for that State" and, under S 900.12(a), on approval of a state program "the Secretary will publish a final rule to be codified under the applicable part number assigned to the State." They argue that this language explicitly incorporates the state standards into federal law. Indeed, they suggest that this incorporation is even more explicit than that at issue in Arkansas v. Oklahoma, 503 U.S. 91 (1992) where all applicable state standards for water quality were found to be effectively incorporated into the Clean Water Act. We disagree.

First, nothing in SMCRA itself explicitly or implicitly incorporates state law as federal law or directs the OSM to do so. Second, it bears repetition that Part 938 of the C.F.R. reserved for Pennsylvania does not set forth any portion of the text, much less the complete text, of the Pennsylvania statutes and regulations approved by the OSM. Rather, the reader is referred to the office locations in

the state of Pennsylvania at which copies of those statutes and regulations can be obtained, and merely identifies the dates the Pennsylvania program was approved, the action taken by the Secretary on amendments proposed by Pennsylvania to its program, and the dates by which Pennsylvania must adopt additional amendments recommended by the Secretary. The federal surface mining regulations, in stark contrast, are "codified" in their full text at 30 C.F.R. Part 772-85. Third, simply referring to a state statute or regulation in the Code of Federal Regulations does not invest it with federal authority, even if the OSM had the authority under the Constitution or under SMCRA to transform state law into federal law, which it does not. Plaintiffs, however, invoke the language of the C.F.R. sections applicable to Pennsylvania and, more particularly, 30 C.F.R. S 938.1, which states that the succeeding sections contain those rules "applicable only within

24

Pennsylvania that have been adopted under the [SMCRA]." Despite plaintiffs' suggestion, the "adopted under" clause cannot imbue a regulation enacted by a Pennsylvania agency, and only applicable within Pennsylvania , with federal authority. This conclusion is supported by the fact that throughout the federal regulations, approved state programs are described not as federal law but as"state laws and regulations"; further, the federal regulations establish different mechanisms for state and federal programs.

Moreover, the state-specific nature of mining standards illustrates why Arkansas v. Oklahoma is inapposite. As that case noted, the Clean Water Act was intended to establish a "uniform system of interstate water pollution regulation" in which the federal role was integral; indeed, the interstate flow of water federalized the issue. 503 U.S. at 110 (emphasis added). Although SMCRA was intended to establish a "nationwide" program of minimum standards for protecting health, safety, and the environment, 30 U.S.C. S 1202(a), Congress also explicitly found that mined areas across the nation had such a range of environmental and "physical conditions" that the "primary governmental responsibility" for developing and regulating each state's program should rest with that state, with the federal role restricted to limited oversight and enforcement only if the state did not do so. S 1201(f). Indeed, the laws in the various states differ because the terrains and environments of the various states differ; if, then, any violation of state law were a violation of federal law, there would be different federal law in every primacy state. Finally, there is no "explicit incorporation" of each state's standards even into the separate C.F.R. subchapters devoted to each state's program, nor do the federal regulations evidence the "intent" to incorporate state standards with which plaintiffs credit them. Nor, of course, could they incorporate state standards, for if Congress could empower the OSM to incorporate state law into federal law by agency action via the OSM's regulations such that states could be sued by

citizens in federal court, the limitations on Congress's authority to override the Eleventh Amendment by means of legislation would be rendered a virtual nullity.

Plaintiffs also rely heavily on our decision in Geis v. Board of Educ. of Parsippany-Troy Hills, 774 F.2d 575 (3d Cir. 1985), where we found that the Individuals with Disabilities Education Act ("IDEA"), formerly known as the Education of the Handicapped Act, explicitly incorporated New Jersey educational standards. To be sure, in both the IDEA and SMCRA "the states are given considerable latitude in establishing the applicable standards, subject to a floor mandated by federal law." Id. at 581. But there are important differences between the two statutes. First, as we have discussed, the incorporation of state standards is not explicit in SMCRA. Second, in the IDEA the federal government "retains considerable authority" to enforce the applicable state standards, id., whereas in SMCRA federal enforcement authority is in large measure restricted to situations where imminent danger to the public or imminent environmental harm is threatened or where the state has defaulted in enforcing its program -- SMCRA, in other words, emphasizes the mutually "exclusive" jurisdiction to regulate by either the particular state or the federal government. Third, in the IDEA, which, unlike SMCRA, is a true cooperative federalism statute, Congress granted state and federal courts concurrent jurisdiction to adjudicate disputes. In sum, then, SMCRA indicates a clear distinction between state and federal law for regulatory purposes, for the enforcement of violations, and for purposes of the Eleventh Amendment. The IDEA does not.

Separate and apart from the reasons why Pennsylvania's program was not incorporated or codified into federal law, it would have made little sense to have done so. The federal standards set forth in SMCRA are simply ones which a state must meet initially for its proposed program to qualify for "exclusive jurisdiction" over the regulation of surface mining within that state. When a state then enacts laws that outline its duties in regulating such mining, it is those state laws that become "directly applicable"; the federal law and regulations, which continue "to provide the'blueprint' against which to evaluate the State's program, 'drop out' as operative provisions," "even though the relevant language in the State law is identical to that in the federal law." Bragg, 248 F.3d at 289, 296. Of course, if a state does not fulfill the duties outlined by those state laws, then either the

United States (in the person of the Secretary), the state, or injured citizens may step in to ensure compliance. The Secretary may step in to withdraw approval of the state's ineffective program or a part thereof and to enforce, in federal court, federal provisions and sanctions for violations of the minimum standards set forth in SMCRA. 30 U.S.C.

SS 1254, 1271. The state shall, upon notice from any person, conduct an inspection of the alleged violation. 52 Pa. Stat. Ann. SS 1396.18c(b), 1406.13(c). And injured citizens, as they have done here, may file suit to enforce the provisions and standards delineated under state law, and Pennsylvania has consented to be sued in state court. 52 Pa. Stat. Ann. SS 1396.18c(a), 1406.13. Suit for violations of state law brought against a state or its officials, however, may simply not be brought in federal court.

The absence of incorporation also illustrates why, as we discussed earlier, the arrangement is not true cooperative federalism. As the Bragg Court put it, SMCRA, unlike other "cooperative federalism" statutes, exhibits"extraordinary" and, indeed, "unparalleled" deference to the states, and a "careful and deliberate" encouragement of"exclusive" state regulation. Id. at 293, 294. In turn, this lack of true cooperative federalism and mutual jurisdiction defeats one of plaintiffs' criticisms of Bragg. They argue that Bragg wrongfully held that the federal government is divested of "direct regulatory authority" under the Interior Board of Land Appeals'14 holdings. In particular, they rely on Central Ohio Coal Co. v. OSMRE, 140 IBLA 1, 6 (July 31, 1997), which holds that "while a primacy state has primary jurisdiction for enforcement of an approved state program, that jurisdiction is not exclusive, and OSM has the authority to enforce the state program on a mine-by-mine basis under proper circumstances." While at least the latter point is correct, it is clear from Central Ohio that the OSM's jurisdiction does not reach the full enforcement authority for which plaintiffs hope. The oversight jurisdiction there was the authority vested in the OSM to inspect specific

---

14. The Interior Board of Land Appeals is part of the Secretary of the Interior's Office. It hears, among other matters, appeals from "decisions rendered by Departmental officials relating to . . . the conduct of surface coal mining under the [SMCRA]." 43 C.F.R.S 4.1(b)(3).

mines, and, if violations were observed, to issue violation notices. See 30 C.F.R. S 843.12(a)(2). Importantly, such notice is given to both the permittee and to the state, "so that appropriate action can be taken by the State." Id. (emphasis added). Because the state has "primary" authority, only if the state fails to act within ten days is further action taken by the OSM, either by issuing another violation notice or a cessation order. This deference to the state's authority clearly indicates that enforcement by the federal government is a last resort; jurisdiction is hardly shared.15 Indeed, as the Hodel Court observed, SMCRA contemplated "enforcement responsibility lying with either the State or Federal Government." Hodel, 452 U.S. at 269.

According to Bragg, to construe SMCRA otherwise

> would circumvent the carefully designed balance that
> Congress established between the federal government

and the States because the effect of a citizen suit to enjoin officials in a primacy State to comport with the federal provisions establishing the core standards for surface coal mining would end the exclusive State regulation and undermine the federalism established by the Act. Thus, rather than advancing the federal interest in preserving this statutory design, [plaintiffs'] interpretation would frustrate it.

248 F.3d at 295 (emphasis in original). This is so because, again, if a state fails to properly administer the provisions and the OSM has done nothing or too little, citizens can sue in state court to enforce the state law standards.16 52

---

15. 30 C.F.R. S 843.11 is even stronger, allowing the OSM to order the cessation of surface mining activity when--consistent with SMCRA's balancing of societal and economic interests--there is imminent danger to health or to the environment. Id. S (a)(1). Again, this reluctance to interfere absent "imminent danger" suggests a deference to state enforcement and an intent to allow federal enforcement only as a last resort. The provisions of 30 U.S.C. S 1271, allowing the revocation of a deficient state program, are similarly to be applied after notice to the state or when there is imminent danger.

16. This is not to adopt the controversial suggestion in Justice Kennedy's Coeur d'Alene opinion that the availability of a state forum to hear a dispute should, virtually without more, bar application of the Ex parte

28

Pa. Stat. Ann. SS 1396.18c(a), 1406.13. They can also bring suit against the Secretary of the Department of the Interior and the Director of the OSM under 30 U.S.C. S 1270 as, of course, they have done here in Counts Nine through Eleven.

Plaintiffs' fall-back position is that even if state law is not incorporated into federal law, Seif has a federally imposed duty to implement specific state provisions that triggers the Ex parte Young exception; in essence, this was the question certified by the District Court. That duty is purportedly based on 30 C.F.R. S 733.11, which does no more than require Pennsylvania to implement, administer, and enforce its program in accordance with SMCRA, "this chapter," and the provisions of the Pennsylvania program. The District Court did not credit this "federal duty" argument, observing that to allow a federal court to sit in judgment of a state concerning the state's duty to satisfy its own regulations contradicts the spirit of the Eleventh Amendment and the Ex parte Young doctrine. Indeed, it seems, if there is such a "federal duty," the Eleventh Amendment would become an irrelevancy.

In support of their "federal duty" argument, plaintiffs point to Barnes v. Cohen, 749 F.2d 1009 (3d Cir. 1984), where we rejected a Pennhurst argument in the context of Pennsylvania's administration of the Aid for Families with Dependent Children ("AFDC") program. That program

involved state payments to needy families that were
matched with federal funds. In order to qualify for the

_____

Young doctrine. 521 U.S. at 270-74. That suggestion has been rejected
by all but one other Member of the Court, the Chief Justice.
Nevertheless, the opportunity to redress violations in state court
emphasizes the primary jurisdiction enjoyed by Pennsylvania.
Parenthetically, it appears that both the Bragg  Court and the District
Court did adopt the conclusion, again joined in only by Justice Kennedy
and the Chief Justice, that a federal court, in determining whether to
exercise jurisdiction over a state official, must engage in a case-by-case
analysis of a number of concerns, including whether a state forum is
available. That error, however, did not affect the principal basis of the
Bragg and District Courts' holdings, i.e.  the plain language of SMCRA
and the Supreme Court's Pennhurst decision.

matching funds program, states were required to set
criteria to determine a minimum income that would qualify
a family for funds, and to determine a payment level of how
much the state would actually pay. States were given"a
great deal of discretion" under the AFDC as to both sets of
criteria. Everett v. Schramm, 772 F.2d 1114, 1115 (3d Cir.
1985) (citation omitted). Plaintiffs brought suit alleging
violations of the standards Pennsylvania had established,
and we concluded that injunctive relief against the state
official was not precluded by the Eleventh Amendment. We
noted the "intensely federal nature of the AFDC program"
as well as its requirement that state plans " 'be in effect in
all political subdivisions of the State, and, if administered
by them, be mandatory upon them.' 42 U.S.C. S 602(a)(1)."
Barnes, 749 F.2d 1019 & n.8. In brief, plaintiffs here urge
that we interpret SMCRA as, in Barnes, we interpreted the
AFDC, finding that it

> [requires] the state to adhere to its own regulations, at
> least so long as the regulations are still in effect. . . .
> [In acting inconsistently] with the state regulation[, t]he
> Pennsylvania officials, then, were not adhering to their
> own regulations and, consequently, violated the state
> . . . plan, thereby transgressing federal law. Thus, the
> Pennhurst case is inapplicable and injunctive relief
> against the state officials is not precluded.

Id. at 1019 (emphasis in original) (footnotes omitted).
Everett came to a similar conclusion, allowing a Section
1983 suit to go forward. 772 F.2d at 1118-19.

Barnes is simply inapplicable. First, of course, Barnes
addressed the incorporation of the state criteria into the
federal AFDC statute, and not any federal regulation that
might impose or purport to impose an ongoing federal duty.
We have explained above why the incorporation argument
must be rejected in the SMCRA context. Relatedly-- a
point that we have also made above -- the interplay of
federal and state governments in SMCRA is more limited
than in other "cooperative federalism" statutes such as the

Clean Water Act, the IDEA, or the "intensely federal" AFDC at issue in Barnes and Everett. The federal agencies administering those statutes, for example, at no point "drop out" of that administration as the OSM does under SMCRA.

The language and structure of the AFDC mandated the result in Barnes and the language and structure of the IDEA mandated the result in Geis; similarly, the unique language and structure of SMCRA mandate a different result here.

Further, the federal duty argument makes as little sense as the incorporation or codification argument, for many of the same reasons. State standards with reference to surface coal mining operations are specifically crafted to a specific state's conditions and may, and frequently do, exceed federal minima in stringency. Where they do, a scenario can easily be envisioned in which state standards are not being met but the minimum standards established by federal law are (assuming, of course, that federal standards were operative after approval of a state program, which, as we have discussed, they are not). Under plaintiffs' theory, a federal duty to enforce state standards would exist even though no standard established by federal law was being violated. It simply stretches 30 C.F.R. S 733.11 too far to say that it imposes a duty under federal law to implement state law. Once primacy was granted, Seif 's"duty" to implement the Pennsylvania program on a day-to-day basis arose under state law. We thus answer with a resounding "yes" the certified question which asked whether Seif was "entitled to Eleventh Amendment immunity from suit in federal court as to allegations of continuing violations of duties under the [approved] Pennsylvania program. . . ."

2. The Remaining Counts

Having determined that Counts One through Six against Seif in federal court are not authorized by the Ex parte Young exception to the Eleventh Amendment, all that remains for our consideration is whether the District Court correctly determined that Counts Seven and Eight allege violations of federal law only and, thus, are not barred by the Eleventh Amendment. The District Court was correct.

Count Seven, we repeat, charges Seif with failing to submit to the OSM certain information required by 30 C.F.R. S 938.16(h). Count Eight charges his failure to submit to the OSM a certain amendment to the

Pennsylvania program that he was required by 30 C.F.R. S 732.17(f)(1) to submit. These counts, in essence, allege that Pennsylvania, via Seif, has not complied with certain specific and ongoing federal oversight requirements, requirements that have no counterpart in state law.

Accordingly, these counts may go forward against Seif under the Ex parte Young exception to the Eleventh Amendment, because plaintiffs seek prospective relief against him for an ongoing violation of a nondiscretionary duty directly imposed by federal law. Parenthetically, this conclusion gives the lie to the federal defendants' suggestion that the language of S 1270(a)(2), allowing a citizens suit in federal court against a state regulatory authority "to the extent permitted by the eleventh amendment," makes no sense if there could never be a violation of federal law once a state program is approved. Indeed, Seif conceded at oral argument that a citizens suit could have been brought in 1982 had any "citizen" believed that primacy had been improperly granted to Pennsylvania.

In anticipation of the conclusion that Counts Seven and Eight fall within the Ex parte Young exception, a conclusion with which he did not take issue at oral argument before us, Seif contends that the Seminole Tribe exception to that exception should apply because of the "detailed remedial scheme" purportedly developed in SMCRA. Seminole Tribe of Florida v. Florida, 517 U.S. 44 (1996). Under Seminole Tribe, if Congress establishes a "detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon Ex parte Young." Id. at 74.

The remedial scheme question has not been addressed in the context of SMCRA. In Bragg, the only other Court of Appeals' analysis of the Eleventh Amendment issues raised here, the Fourth Circuit explicitly declined to do so. 248 F.3d at 290 n.3. Briefly, the question is whether the scope of the statutory remedy Congress established displaces the "default option" of an Ex parte Young suit. Where Congress explicitly outlines a detailed remedial scheme for a statutory violation, the Seminole Tribe Court cautioned hesitation before "casting aside those limitations" and

32

permitting an action based on Ex parte Young. Seminole Tribe, 517 U.S. at 74, 76. This caution essentially defers to Congress's authority to define remedies for rights it has defined.

As the District Court pointed out, however, SMCRA does not contain a detailed remedial scheme such that a federal court's ability to hear the case would be suspended. SMCRA merely provides for the OSM to take over regulatory authority upon the failure in whole or in part of a state program. Although both the District Court and Seif focus on the "invasive" nature of this "remedy," more to the point is that there is no clear expression by Congress of what remedies should apply when a SMCRA violation is found other than (a) a takeover by the OSM in whole or in part, or (b) suit in federal court. Neither is there any indication by Congress of an intent to limit remedies. It must be remembered that suit in federal court is explicitly allowed

"to the extent allowed by the eleventh amendment,"
S 1270(a)(2), which further suggests that Ex parte Young
suits were intended to go forward where appropriate.
Accordingly, the District Court correctly concluded that the
Seminole Tribe remedial scheme doctrine does not preclude
an Ex parte Young suit under SMCRA.

One final note. These are interlocutory appeals in which
the ultimate question is whether Seif was or was not
properly accorded Eleventh Amendment immunity. Seif
suggested at oral argument that there are other reasons
why Counts Seven and Eight should be dismissed -- for
example, that what plaintiffs allege in those counts is an
ongoing "administrative process" between the OSM and the
DEP that, in plaintiffs' view, is moving too slowly but, Seif
says, is not something that Congress intended a citizens
suit to address. Any "other reasons" Seif may have for
seeking the dismissal of Counts Seven and Eight are not for
us to consider on these appeals and must await
consideration by another court on another day.

IV.

CONCLUSION

We, therefore, will affirm the orders of the District Court
insofar as they dismissed Counts Two, Four, Five, and Six

and declined to dismiss Counts Seven and Eight. We
reverse those orders insofar as they denied Seif 's motion to
dismiss Counts One and Three, and remand with
instructions to dismiss those counts without prejudice so
that plaintiffs may present them and Counts Two, Four,
Five, and Six in the appropriate forum. Each party to these
appeals to bear its own costs.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit